UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **DENNIS ALLEN, et al.** | : | Case No. C-1-01-159 |
| **Plaintiffs** | : | |
| | | Judge Herman S. Weber |
| v. | : | |
| | | Magistrate Judge Timothy S. Hogan |
| **JOHN CRARY, et al.** | : | |
| Defendant/ | : | |
| Third-Party Plaintiff | | **THIRD-PARTY DEFENDANT SHIRLEY MONROE S MEMORANDUM IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT OF THIRD-PARTY CLAIM ASSERTED BY DEFENDANT JOHN L. CRARY** |
| | : | |
| v. | | |
| | : | |
| **POLLY JONES, et al.** | | |
| | : | |
| Third-Party Defendants | | |
| | : | |

\* \* \* \* \*

## I. INTRODUCTION

Third-Party Defendant, Shirley Monroe ( Monroe ), submits this memorandum in support of her motion for summary judgment on the third-party claim for indemnity asserted against her by Defendant John L. Crary ( Crary ). Crary asserted this third-party claim against Monroe (and Polly Jones and James Thelan), shortly after Magistrate Judge Hogan denied Crary s motion to dismiss the claims asserted against him by Plaintiffs, Dennis Allen et al. ( Plaintiffs ) under the Employee Retirement Income Security Act of 1974 ( ERISA ). See 29 U.S.C. §1001, et seq. Crary has no basis to bring such a claim against Monroe who, like so many other former employees of Lassen, was the victim of Lassen management s destruction of the employee benefit plans. Crary, who did nothing to stop the demise of the plans, has drawn Monroe into

this dispute based on the dubious and unsupported proposition that Monroe acted as a fiduciary to the plans. As explained more fully below, Monroe is entitled to summary judgment because (1) no such claim for indemnity is permitted in an ERISA action and (2) even if Crary could bring such a claim, he cannot recover against Monroe because there is no evidence that Monroe acted as a plan fiduciary, as that term is defined by ERISA.

## II.  STATEMENT OF FACTS

**A.    Monroe's Employment at Wright-Bernet Began in 1996 and Continued After Lassen Bought the Company Two Years Later.**

In 1996, Shirley Monroe began working for Wright-Bernet, Inc. ("Wright-Bernet"), a manufacturer of industrial brooms and brushes located in Hamilton, Ohio. (Deposition of Shirley Monroe, April 24, 2002 ("Monroe's dep. I"), page 6; Declaration of Shirley Monroe, Paragraph 1, attached herewith as "Exhibit A"). When Monroe's employment began, Wright-Bernet was owned by the Ecko Group. Two years later, in the end of 1998, the Lassen Companies, Inc. ("Lassen") purchased Wright-Bernet. By this time, Monroe, who had started with Wright-Bernet as an administrative assistant, had job responsibilities over human resources issues at the Wright-Bernet plant and a nearby warehouse in Monroe, Ohio. (Monroe's dep. I at 15-17).

In October, 1999, Monroe became "director of human resources" for Lassen. (Monroe's dep. I at 6, 26-27; Monroe's dec., ¶ 2). In this capacity, she had responsibilities over human resources issues for Wright-Bernet, its nearby warehouse in Monroe, Ohio, two other facilities owned by Lassen in Indiana and Tennessee, and Lassen's headquarters in Irvine, California. (Monroe's dep. I at 26-28). However,

despite the director title, Monroe did not oversee a human resources department. Monroe was the sole employee in human resources at Lassen; she had no subordinate employees. (Monroe's dec., ¶ 2). In turn, she reported to Mike Lindemuth, who was the director of operations for Wright-Bernet from January 1, 1999 to December, 2000. (Monroe's dep. I at 44). She also considered Lenn Kristal, Lassen's CEO, and James Thelan, Lassen's controller, both of whom worked at Lassen's headquarters in California, to be her bosses.[1] (Monroe's dep. I at 44).

Except for a period of time between approximately May and October of 1999, when another employee acted as Wright-Bernet's payroll clerk, Monroe was the default payroll clerk at Wright-Bernet. (Deposition of Shirley Monroe, August 27, 2003 ("Monroe's dep. II"), pages 9-11; Monroe's dec., ¶ 3). The company used ADP, a payroll service company, to prepare the paychecks for employees at Wright-Bernet. (Monroe's dep. II at 9-10). Using ADP's computer software, Monroe forwarded the necessary information to ADP so that they could calculate the employees' net pay and issue paychecks. (Monroe's dep. II at 11, 13-14; Monroe's dec., ¶ 3). Typically, the only new information that Monroe had to prepare and forward each week to ADP was the number of hours worked by each hourly employee. (Monroe's dec., ¶ 3). Information concerning payroll deductions, such as employee contributions to the health plan, generally did not change week-to-week. If not advised of any change in the amount of an employee's contribution, ADP simply would continue to deduct that amount from the employee's gross pay to determine net pay. (Monroe's dec., ¶ 3).

---

[1] Leslie Leath replaced Thelan as Lassen's controller in October, 2000. (Deposition of Leslie Leath, p. 10).

After receiving the payroll information from Wright-Bernet, ADP staff would then sign and issue the payroll checks, which were drawn on Lassen's local bank account in Hamilton. (Monroe's dec., ¶ 4; Monroe's dep. I at 69-70). Lassen management in California, as opposed to local employees like Monroe, was responsible for wiring sufficient funds from company bank accounts in California to the local bank account in Hamilton. (Monroe's dec., ¶ 4). Monroe had no responsibilities regarding the funding of this bank account. (Monroe's dec., ¶ 4). In fact, Monroe, like many other employees at Wright-Bernet in the years after Lassen's purchase of the company, had her paycheck "bounce" numerous times due to Lassen management's failure to properly fund the local payroll account. (Monroe's dec., ¶ 11).

Every week, Monroe provided this same payroll information to Lassen headquarters in California. (Monroe's dep. I at 67-68; Monroe's dec., ¶ 5). It was then management's responsibility in California to ensure that payroll deductions, such as deductions for taxes and health plan contributions, were remitted to the appropriate accounts and tax authorities, as necessary. Monroe had no responsibilities in this area. (Monroe's dec., ¶ 5).

**B.    Because of Lassen's Failure to Make Timely Payments to its Insurance Carrier, Lassen's Employee Health Benefit Plans Were Put on Administrative Hold.**

With respect to employee health benefits, Lassen offered a preferred provider organization plan (PPO) and health maintenance organization plan (HMO) (collectively, "Health Plans"). (Deposition of Polly Jones, pages 22-23; Monroe's dep. I at 52-53). The Health Plans were partially self-insured plans. Under this arrangement, Lassen

paid Great-West Life & Annuity Insurance Company ( Great West ) both a monthly premium to pay for the fixed costs of administering the plan and a monthly payment to cover health benefit claims made by Lassen s employees. If the value of the monthly claims exceeded a certain amount, Great West s stop-loss coverage was triggered. (Jones s dep. at 13, 23-25; Depo. Exh. 30 (Services Contract between Great West and Lassen); Deposition of Randy Pickering, pages 23-25). As noted above, Wright-Bernet employees made monthly contributions to the Health Plans by way of weekly payroll deductions. (Monroe s dep. I at 41-42).

    In September of 1999, Monroe discovered that Great West had put the Health Plans on  administrative hold.  (Monroe s dep. II at 61).[2] Lassen s controller in California confirmed with Monroe that the plans were on administrative hold as a result of Lassen s failure to pay Great West. (Monroe s dep. I at 43, 45; Monroe s dec., ¶ 7). While the plans were on administrative hold, Lassen continued to deduct employee contributions from Wright Bernet employees  paychecks. Monroe did not personally discuss this ongoing practice with anyone in Lassen s management in California, as she knew they were aware of the deductions through her weekly payroll reports. (Monroe s dep. I at 50; Monroe s dec., ¶ 9).[3]

---

[2] Monroe testified at her first deposition that she found out about the administrative hold as early as July or August of 1999. (Monroe s dep. I at 39). However, the date that Monroe learned about the administrative hold is not particularly significant, nor is it material to a resolution of this motion.

[3] Lassen management also may have been aware of the deductions in other ways. There is no evidence to suggest that only Wright-Bernet employees had these deductions taken out of their paychecks during the administrative hold. Presumably, this same practice was followed for all Lassen employees, including those who worked at Lassen headquarters in California. (Monroe s dec., ¶ 8). Employees in Lassen s accounting department in California, not Monroe, prepared the payroll for employees at that location. (Monroe s dep. II at 18-19).

The administrative hold was lifted in October, 1999, but regrettably was reinstated a few months later in February, 2000, again due to Lassen's ongoing failure to pay Great West and fund the claims account. (Monroe's dep. I at 41-42, 54, 71-72; Pickering's dep. at 26-27). During both periods of time that the Health Plans were on administrative hold, in 1999 and 2000, Monroe forwarded Wright-Bernet's payroll information on a weekly basis to Lassen management in California. (Monroe's dep. I at 67-68, Monroe's dec., ¶ 7). The payroll reports she forwarded clearly reflected that the company was deducting employee contributions to the Health Plans from weekly paychecks. (Monroe's dec., ¶ 8). Despite the fact that Lassen management in California received the weekly payroll reports from Monroe, management never instructed ADP, nor instructed Monroe to advise ADP, to stop deducting employee's plan contributions from their paychecks while the plan was on administrative hold in 1999 and 2000. (Monroe's dep. I at 50; Monroe's dec., ¶s 6-7).

Monroe had no control over company funds. Monroe never signed company checks, including payroll checks, nor did she have the authority to do so. (Monroe's dec., ¶ 10). Unlike her bosses in California, Monroe had no access to Lassen's bank accounts upon which the payroll funds were drawn. (Monroe's dep. I at 68). Monroe likewise had no access to the claims account into which the employee's health plan contributions were supposed to be deposited. (Monroe's dep. I at 41; Monroe's dec., ¶ 10; Pickering's dep. at 26-27).

C.    **Monroe was Powerless to Resolve the Deteriorating Situation with the Health Plans.**

The continuing difficulties with the Health Plans were especially frustrating for

Monroe. Her husband had serious health problems in 1999 and 2000 and was quickly incurring significant medical bills, yet there was nothing Monroe could do to have the administrative hold lifted, despite her best efforts. (Monroe's dep. I at 102; Depo. Exh. 17; Monroe's dep. II at 46). In September of 1999, Monroe told Robert Morris, a vice-president at Lassen, that the Health Plans were on hold and medical bills were not being paid by Great West. She spoke to Morris on numerous occasions, hoping that he or someone in Lassen management could do something to remedy the problem with the funding of the plans. (Monroe's dep. I at 24; Monroe's dep. II at 44-46).[4] After learning that Great West had put the Health Plans on administrative hold again in February, 2000, Monroe had numerous conversations during this time about this problem with Lassen's management, including James Thelan and Lenn Kristal. (Monroe's dep. I at 95; Monroe's dep. II at 57; Monroe's dec., ¶ 9).

Unfortunately, the situation ultimately resulted in Great West's notifying Lassen in July, 2000, that it was terminating the Health Plans. (Monroe's dep. I at 71-72, 103; Depo. Exh. 69 (July 19, 2000 letter from Great West to Lassen)). Monroe only discovered Great West's intent to terminate the Health Plans when her husband was notified of this development by a customer service representative at Great West. (Monroe's dep. I at 55-56). Monroe's employment at Lassen ended the following year, on September 24, 2001. (Monroe's dep. I at 100). By this time, she had countless paychecks "bounce" due to Lassen's financial woes and fiscal mismanagement.

---

[4] When Angela Jones, a Wright-Bernet employee, asked Monroe about what could be done about the non-payment of her medical and dental bills, Monroe explained that the problem was due to Lassen's failure to pay Great West and then advised Ms. Jones to contact the Ohio Department of Insurance or the U.S. Department of Labor. (Monroe's dep. I at 40; Depo Exh. 16 (September 30, 1999 memo from Monroe to Angela Jones)).

(Monroe's dep. II at 27; Monroe's dec., ¶ 11). Accordingly, in addition to incurring the expense of numerous medical bills, Monroe received no compensation for approximately the last three months of her employment at Lassen. (Monroe's dep. I at 102; Monroe's dec., ¶ 11).

### III. ARGUMENT

**A.  Under the Settled Standard for Summary Judgment Under Rule 56, Monroe is Entitled to Summary Judgment Because There is No Genuine Issue of Material Fact.**

Summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court has explained that these principles require that a "party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion." *Southwest Ohio Reg'l Council of Carpenters & Joiners of Am. v. Schaefer*, 267 F. Supp. 2d 813 (S.D. Ohio 2003) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)). Once the moving party has carried its initial burden of demonstrating the absence of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be

viewed in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Under this settled standard, Monroe is entitled to summary judgment, as explained below.

**B.    The Third-Party Claim Against Monroe Should Be Dismissed Because, as a Matter of Law, a Plan Fiduciary Cannot Seek Indemnity from an Alleged Co-Fiduciary in an ERISA Case.**

As set forth in the memorandum supporting Third-Party Defendants Polly Jones s and Monroe s motion to dismiss, Crary cannot, as a matter of law, assert a third-party claim for indemnity against an alleged co-fiduciary in response to a claim for relief asserted against him. (See Memorandum in Support of Motion to Dismiss; R. 49). ERISA does not provide for such a remedy, and the Supreme Court has recently reiterated its position that remedies sought in an ERISA action are generally limited to those remedies specifically enumerated in the statute. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). Moreover, this year, the Northern District of Ohio again   - for the third time   - has expressly held that the right of contribution or indemnity, as asserted here by Crary, is not available under ERISA. *Williams v. Provident Investment Counsel, Inc.,* 2003 U.S. Dist. LEXIS 15348 (N.D. Ohio 2003) (following *Roberts v. Taussig*, 39 F. Supp.2d 1010, 1011-12 (N.D. Ohio 1999); *Daniels v. National Employee Ben. Services, Inc.*, 877 F. Supp. 1067, 1073-74 (N.D. Ohio 1995)). (A copy of the *Williams* decision is attached here as  Exhibit B. ) This Court should follow these well-reasoned decisions of the Northern District and thereby grant the instant motion, or alternatively the previously-filed motion to dismiss, on this basis.[5]

---

[5]  While Crary repeatedly has asserted that he is entitled to indemnification because he allegedly is a victim of collusion by the Plaintiffs, Crary and Jones, and their lawyers, the Northern District flatly

**C.      Monroe Was Not A Plan Fiduciary Because Her Job Duties With Respect to Lassen's Benefit Plans Were Purely Ministerial.**

Assuming, *arguendo*, that a defendant fiduciary can bring a third-party claim for indemnity against an alleged co-fiduciary in an ERISA action, Crary's claim against Monroe still is subject to summary judgment because there is no evidence to support a finding that Monroe acted as a fiduciary to Lassen's benefit plans. Under ERISA, a person is a plan fiduciary to the extent he or she (i) exercises any discretionary control or discretionary authority over plan management or any authority or control over management or disposition of plan assets, (ii) renders investment advice regarding plan assets for a fee or other compensation, or has authority or responsibility to do so, or (iii) has any discretionary authority or responsibility in plan administration. 29 U.S.C. § 1002(21)(A), ERISA § 3(21)(A). Based on the allegations in Crary's Third-Party Complaint, Monroe purportedly satisfies the first and third categories in the statutory definition of fiduciary.[6] As explained below, these allegations are flatly inconsistent with the limited nature of Monroe's job duties with respect to the benefit plans.

**1.      Monroe Exercised No Discretionary Control or Authority Over Plan Management or the Management or Disposition of Plan Assets.**

In alleging that Monroe was a plan fiduciary, Crary primarily focuses on Monroe's payroll duties at Lassen. (*See* Third-Party Complaint, ¶s 9, 13; R. 45). He

---

rejected this same argument. In *Williams*, the Court reasoned that in an ERISA action, plaintiffs should be permitted to do that which the trustees have done here -- namely, choose, if they believe they are able to do so, among various targets. The Court further stated that [w]hile this opportunity may well give rise to collusiveness, as [the defendant fiduciary] suggests, it also enables greater efficiency and enhances the likelihood of more prompt recovery against the party that, in the plan's eyes, appears either most culpable or judgment-worthy, or both. *Id.* at *20.

[6] Crary does not allege that Monroe rendered investment advice or had the authority to do so, which of course she did not. *See* 29 U.S.C. § 1002(21)(A)(ii), ERISA § 3(21)(A)(ii).

specifically attempts to blame Monroe for Lassen's practice of deducting employee contributions to the Health Plans while the plans were on administrative hold. (*See id.*, ¶13). This is absurd. There is no evidence that Monroe had the authority to stop the company's practice of making these deductions during the administrative hold. She merely was a conduit of information to both ADP and Lassen's management in California regarding Wright-Bernet's weekly payroll. (*Supra*, p. 6). In addition, Monroe had no access to the plan assets, nor did she have any control over what Lassen actually did with the employee deductions. (*Id.*) Perhaps inadvertently, Crary accurately describes Monroe's role at Lassen when he alleges that she "assisted with preparation of the payroll." (*See* Third-Party Complaint, ¶13; R. 45). Despite her glorified title of "director of human resources," Monroe was Lassen's payroll clerk, not a plan fiduciary.

It is settled law under ERISA that an individual does *not* act as a plan fiduciary when her duties with respect to a benefit plan are only "ministerial" in nature. *See, e.g., Hamilton v. Carrell*, 243 F.3d 992, 1000 (6th Cir. 2001); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1998); *Sengpiel v. B. F. Goodrich Co.*, 156 F.3d 660, 667 (6th Cir. 1998); *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 401-402 (6th Cir. 1997). The Department of Labor has provided excellent guidance on this subject, citing specific examples of "purely ministerial duties" that do not trigger fiduciary status under ERISA. 29 C.F.R. § 2509.75-8, Question and Answer D-2 (2003) (copy attached herewith as "Exhibit C"). In two recent decisions, this very Court specifically relied on the Department's guidance in analyzing the duties of an alleged fiduciary. *See*

*Freimark & Thurston Agency, Inc. v. Natl. City Bank of Dayton*, 231 F. Supp. 2d 713, 718-719 (S.D. Ohio 2002) (J. Rice); *Flanagan Lieberman Hoffan & Swaim v. Transamerica Life and Annuity Co.*, 228 F. Supp. 2d 830, 841 (S.D. Ohio 2002) (J. Rice); see also, *Six Clinics Holding Corp.*, 119 F.3d at 401-402 (citing 29 C.F.R. § 2509.75-8).

In its list of purely ministerial duties, the Department identifies [c]ollection of contributions and application of contributions as provided in the plan. See 29 C.F.R. § 2509.75-8, D-2. This is precisely the duty that Crary attributes to Monroe as support for the allegation that she was a fiduciary. As is clear, the exercise of such duties with respect to contributions is not sufficient to trigger fiduciary status. However, what makes Crary's allegation against Monroe even weaker here is that Monroe did not actually collect the contributions for the Health Plans. She simply provided information to Lassen management in California about Wright-Bernet's payroll so that Lassen management could then take the necessary steps to fund the payroll account and the benefit plan claims account. Monroe never exercised any control over the contributions themselves. She did not sign the checks, and she had no access to the bank accounts. (*Supra*, p. 6). In short, there simply is no evidence that Monroe exercised any authority and control over the management and disposition of the employee plan contributions, or any other assets of Lassen's benefit plans. See 29 U.S.C. § 1002(21)(A)(i), ERISA § 3(21)(A)(i). Thus, Monroe was not a fiduciary under this statutory definition.

### 2. Monroe Exercised No Discretionary Authority or Responsibility Over Administration of the Benefit Plans.

Perhaps in the interest of covering all of his bases, Crary also alleges that Monroe had authority over the administration of the Lassen's benefit plans. (*See* Third-Party Complaint, ¶8; R. 45); 29 U.S.C. § 1002(21)(A)(iii), ERISA § 3(21)(A)(iii).[7] With respect to the administration of Lassen's benefit plans, the only evidence in the record on this subject is that Monroe may have performed the kind of purely ministerial duties described in the Department of Labor's Guidance, such as maintaining participants employment records and advising employees of their rights and options under the plans. *See* 29 C.F.R. § 2509.75-8, D-2 (4), (7); (Monroe's dep. II at 8-12; Monroe's dep. I at 87). There certainly is no evidence that Monroe took any action that would reflect her purported discretionary authority or discretionary responsibility in the administration of Lassen's benefit plans. *See* 29 U.S.C. § 1002(21)(A), ERISA § 3(21)(A). Absent such evidence, Monroe cannot, as a matter of law, be deemed a fiduciary under this statutory definition. She therefore is entitled to summary judgment.

### V. CONCLUSION

In sum, Crary's claim against Monroe is subject to summary judgment because ERISA does not permit a fiduciary to seek indemnity from an alleged co-fiduciary, and even if such an action was permissible, there is no evidence in the record that Monroe acted as a plan fiduciary, as defined in ERISA. Moreover, the very assertion of this

---

[7] Crary's allegation against Monroe with respect to Lassen's 401-K plan is particularly odd. He alleges that she functioned as a fiduciary with respect to the 401-K plan and then cites ERISA Section 3(16)(A), 29 U.S.C. Section 1002(16)(A). (*See* Third-Party Complaint, ¶9.) This section of ERISA defines the term administrator, not fiduciary. Monroe was not the named plan administrator for any of Lassen's benefit plans.

claim flies in the face of Crary's oft-repeated protestations of injustice in this case. (*See* Crary's Memorandum in Support of his Motion for Summary Judgment, p. 18; R. 68). In Crary's pursuit of purported justice, he asserts a claim against a former *payroll clerk*. This is certainly adding insult to injury for Monroe. Not only did Monroe have to suffer through almost three years of working for Crary's company, where employees paychecks regularly bounced and health plans were not funded, she then is sued by the company's former majority owner and Board Chairman on the false claim that she was a plan fiduciary.

It is regrettable that Monroe was forced to defend this claim, which is unsupported by the applicable law and the facts of this case. It should proceed no further. Based on the foregoing, Monroe respectfully requests that this Court grant summary judgment on this claim in its entirety.

    Respectfully submitted,

    s/ David M. Cook

    _____
    David M. Cook (0023469)
    Stephen A. Simon (0068268)
    DAVID M. COOK, LLC
    22 West Ninth Street
    Cincinnati, Ohio 45202
    Phone: (513) 721-7500
    Fax:    (513) 721-1178

    Trial Attorneys for Shirley Monroe

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing has been served this 10th day of November, 2003, via U.S. regular mail, postage prepaid, upon the following:

Leonard Kristal
107 Diablo Drive
Kentfield, California 94904

Stephen R. Felson
617 Vine Street
Suite 1401
Cincinnati, Ohio 45202
Trial Attorney For Defendant Crary

Paul D. Marotta
Christopher D. Denny
Jennifer Chen
The Corporate Law Group
500 Airport Blvd., Suite 120
Burlingame, CA 94010
Of Counsel for Defendant Crary

                                              s/ David M. Cook
                                              _____
                                              ATTORNEY FOR SHIRLEY MONROE