UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **DENNIS ALLEN, et al.** | : | |
| | | Case No. C-1-01-159 |
| **Plaintiffs** | : | |
| | | Judge Herman S. Weber |
| **v.** | : | |
| | | Magistrate Judge Timothy S. Hogan |
| **JOHN CRARY, et al.** | : | |
| | | |
| **Defendant/** | : | |
| **Third-Party Plaintiff** | | **THIRD-PARTY DEFENDANT SHIRLEY** |
| | : | **MONROE'S PROPOSED FINDINGS** |
| **v.** | | **OF FACT AND CONCLUSIONS OF** |
| | : | **LAW** |
| **POLLY JONES, et al.** | | |
| | : | |
| **Third-Party Defendants** | | |
| | : | |

*   *   *   *

Third-Party Defendant, Shirley Monroe ("Monroe"), in connection her filing of a
Motion for Summary Judgment on Defendant John L. Crary's Third-Party Complaint,
submits her proposed Findings of Fact and Conclusions of Law, as follows:

I.    **FINDINGS OF FACT**

A.    **Dates and Job Titles for Monroe at Lassen.**

1.    In 1996, Shirley Monroe began working for Wright-Bernet, Inc.

    a.    (Shirley Monroe Deposition, April 24, 2003 ("Monroe's dep. I"),
page 6).

2.    After the Lassen Companies, Inc. ("Lassen") purchased Wright-
Bernet in 1998, Monroe continued to work at Wright-Bernet as an
employee of Lassen until her last day of employment on September

24, 2001.

    a.    (Monroe's dep. I at 15-17, 100).

3.    Monroe held the position of human resources coordinator at Wright-Bernet until October, 1999.

    a.    (Declaration of Shirley Monroe, Paragraph 2).

4.    Monroe held the position of Lassen's "director of human resources" from October, 1999, until her last of employment at Lassen.

    a.    (Monroe's dep. I at 6, 26-27).

    b.    (Declaration of Shirley Monroe, ¶2).

5.    Monroe was the only employee in Lassen's human resources department, and she had no subordinate employees.

    a.    (Monroe's dec., ¶ 2).

**B.    Monroe's Payroll Duties and Lack of Access to Company Funds.**

6.    Except for a period of time between approximately May and October of 1999, when another employee acted as Wright-Bernet's payroll clerk, Monroe was the default payroll clerk at Wright-Bernet.

    a.    (Deposition of Shirley Monroe, August 27, 2003 ("Monroe's dep. II"), pages 9-11).

    b.    (Monroe's dec., ¶ 3).

7.    Wright-Bernet used ADP to prepare the paychecks for employees at Wright-Bernet.

    a.    (Monroe's dep. II at 9-10).

8.    Every week, Monroe forwarded payroll information to ADP so that

2

they could calculate the employees' net pay and issue paychecks.

    a.    (Monroe's dep. II at 11, 13-14).

    b.    (Monroe's dec., ¶ 3).

9.    Typically, the only new information that Monroe had to prepare and forward each week to ADP was the number of hours worked by each hourly employee.

    a.    (Monroe's dec., ¶ 3).

10.    Monroe generally did not send new information each week to ADP concerning employees' health plan contributions.

    a.    (Monroe's dec., ¶3).

11.    After receiving the payroll information from Wright-Bernet, ADP staff would then sign and issue the payroll checks, which were drawn on Lassen's local bank account in Hamilton.

    a.    (Monroe's dec., ¶ 4).

    b.    (Monroe's dep. I at 69-70).

12.    Lassen management in California was responsible for wiring sufficient funds from company bank accounts in California to the local bank account in Hamilton.

    a.    (Monroe's dec., ¶ 4).

13.    Monroe had no responsibilities regarding the funding of this bank account, and she had no access to this bank account.

    a.    (Monroe's dec., ¶s 4-10).

14.    Monroe never signed company checks, including payroll checks, nor

did she have the authority to do so.

    a.    (Monroe's dec., ¶ 10).

15.    Monroe had no access to the claims account into which the employee's health plan contributions were supposed to be deposited.

    a.    (Monroe's dep. I at 41).

    b.    (Monroe's dec., ¶ 10).

16.    Every week during her employment at Lassen, Monroe provided payroll information to Lassen headquarters which reflected the amount of gross and net pay of each employee, including the amounts of their payroll deductions.

    a.    (Monroe's dep. I at 67-68).

    b.    (Monroe's dec., ¶ 5).

17.    It was Lassen management's responsibility, not Monroe's, to ensure that payroll deductions, such as deductions for taxes and health plan contributions, were remitted to the appropriate accounts and tax authorities, as necessary.    Monroe had no responsibilities in this area.

    a.    (Monroe's dec., ¶ 5).

C.    **Health Plans Put on Administrative Hold.**

18.    Lassen offered a preferred provider organization plan (PPO) and health maintenance organization plan (HMO) to its employees as their health plans ("Health Plans").

4

a.    (Deposition of Polly Jones, pages 22-23).

b.    (Monroe's dep. I at 52-53).

19.    Great West Insurance Company, Lassen's insurance carrier, put the Health Plans on administrative hold twice, once in 1999 and again in 2000, after which Great West notified Lassen in July, 2000, that it was terminating the plans.

a.    (Monroe's dep. I at 41-42, 54, 71-72).

b.    (Deposition of Randy Pickering, pages 26-27).

20.    In September of 1999, Monroe discovered that Great West had put the Health Plans on "administrative hold," which Lassen's controller, James Thelan, told Monroe was the result of Lassen's failure to pay Great West.

a.    (Monroe's dep. I at 43, 45; Monroe's dep. II at 61);

b.    (Monroe's dec., ¶ 7).

21.    While the plans were on administrative hold, Lassen continued to deduct employee contributions from Wright Bernet employees' paychecks.

a.    (Monroe's dep. I at 50).

b.    (Monroe's dec., ¶ 9).

22.    Monroe did not personally discuss this ongoing practice in 1999 with anyone in Lassen's management in California, as she knew they were aware of the deductions through her weekly payroll reports.

a.    (Monroe's dep. I at 50).

b.    (Monroe's dec., ¶ 9).

23.    During both periods of time that the Health Plans were on administrative hold, in 1999 and 2000, Monroe forwarded Wright-Bernet's payroll information on a weekly basis to Lassen management in California.

a.    (Monroe's dep. I at 67-68).

b.    (Monroe's dec., ¶ 7).

24.    The payroll reports Monroe forwarded to Lassen management in California on a weekly basis clearly reflected that the company was deducting employee contributions to the Health Plans from weekly paychecks.

a.    (Monroe's dec., ¶ 8).

25.    Lassen management never instructed ADP, nor instructed Monroe to advise ADP, to stop deducting employees' plan contributions from their paychecks while the plan was on administrative hold in 1999 and 2000.

a.    (Monroe's dep. I at 50).

b.    (Monroe's dec., ¶s 6-7).

26.    In September of 1999, Monroe told Robert Morris, a vice-president at Lassen, that the Health Plans were on hold and medical bills were not being paid by Great West.  She spoke to Morris on numerous occasions, hoping that he or someone in Lassen management could "do something" to remedy the problem with the funding of the plans.

6

      a.     (Monroe's dep. I at 24).

      b.     (Monroe's dep. II at 44-46).

27.    After learning that the Health Plans were again put on administrative hold in February, 2000, Monroe had numerous conversations during this time about this problem with Lassen's management, including James Thelan and Lenn Kristal.

      a.     (Monroe's dep. I at 95).

      b.     (Monroe's dep. II at 57).

      c.     (Monroe's dec., ¶ 9).

28.    Monroe only discovered Great West's intent to terminate the Health Plans when her husband was notified of this development by a customer service representative at Great West in July, 2000.

      a.     (Monroe's dep. I at 55-56).

## II.   CONCLUSIONS OF LAW

1.    Crary cannot assert this third-party claim against Monroe because, as a matter of law, a plan fiduciary cannot assert a third-party claim for indemnity against an alleged fiduciary under ERISA.

29 U.S.C. § 1002(21)(A), ERISA § 3(21)(A); 29 U.S.C. § 1104(A), ERISA § 404(A) *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002); *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985); *Williams v. Provident Investment Counsel, Inc.*, 2003 U.S. Dist. LEXIS 15348 (N.D. Ohio 2003); *Roberts v. Taussig*, 39 F. Supp.2d 1010, 1011-12 (N.D. Ohio 1999); *Daniels v. National Employee Ben. Services,*

*Inc.*, 877 F. Supp. 1067, 1073-74 (N.D. Ohio 1995); *Kim v. Fujikawa*, 871 F.2d 1427 (9th Cir. 1989); *Call v. Sumitomo Bank of California*, 689 F.Supp. 1014 (N.D. Cal. 1988), *aff'd in part and rev'd in part.* 881 F.2d 626 (9th Cir. 1989); *Narda, Inc. v. Rhode Island Hosp. Trust Nat'l Bank*, 744 F.Supp. 685 (D. Md. 1990); *Mutual Life Ins. Co. v. Yampol*, 706 F.Supp. 596 (N.D. Ill. 1989); *Franklin v. Aetna Life Ins. Co.*, 10 EBC 1022 (D. S.C. 1988); *McClendon v. Continental Group, Inc.*, 7 EBC 2403 (D. N.J. 1986); *Whitfield v. Lindemann*, 853 F.2d 1298, 1303 (5th Cir 1988); *Donovan v. Robbins*, 752 F.2d 1170 (7th Cir. 1985); *McLaughlin v. Biasucci*, 688 F.Supp. 965 (S.D. N.Y. 1988); *Brock v. Gillikin*, 677 F.Supp. 398 (E.D. N.C. 1987).

2.    Monroe cannot be held liable on Crary's claim for indemnity, as a matter of law, because Monroe was not a fiduciary in that her job duties with respect to Lassen's benefit plans were purely ministerial.

29 C.F.R. § 2509.75-8, Question and Answer D-2 (2003); *Hamilton v. Carrell*, 243 F.3d 992, 1000 (6th Cir. 2001); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1998); *Sengpiel v. B. F. Goodrich Co.*, 156 F.3d 660, 667 (6th Cir. 1998); *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 401-402 (6th Cir. 1997); *Freimark & Thurston Agency, Inc. v. Nat'l. City Bank of Dayton*, 231 F. Supp. 2d 713, 718-719 (S.D. Ohio 2002); *Flanagan Lieberman Hoffan & Swaim v. Transamerica Life and Annuity Co.*, 228 F. Supp. 2d 830, 841 (S.D. Ohio 2002).

3.    Crary's third-party claim of indemnity against Monroe is subject to summary

      judgment because there is no genuine issue of material fact regarding this

      claim and such claim must fail as a matter of law.

Fed. R. Civ. Pro. 56(c); see citations in prior sections.

Respectfully submitted,

s/ David M. Cook

David M. Cook (0023469)
Stephen A. Simon (0068268)
DAVID M. COOK, LLC
22 West Ninth Street
Cincinnati, Ohio 45202
Phone: (513) 721-7500
Fax:    (513) 721-1178

Trial Attorneys for Shirley Monroe

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served this 10th day of November, 2003, via U.S. regular mail, postage prepaid, upon the following:

Leonard Kristal
107 Diablo Drive
Kentfield, California 94904

Stephen R. Felson
617 Vine Street
Suite 1401
Cincinnati, Ohio 45202
Trial Attorney For Defendant Crary

Paul D. Marotta
Christopher D. Denny
Jennifer Chen
The Corporate Law Group
500 Airport Blvd., Suite 120
Burlingame, CA 94010
Of Counsel for Defendant Crary

s/ David M. Cook

ATTORNEY FOR SHIRLEY MONROE