UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI

| | | |
|---|---|---|
| Dennis Allen, et al. | : | |
|     Plaintiffs | : | Case No. C-1-01-159 |
|     v. | : | Judge Herman S. Weber |
| Leonard Kristal | : | Magistrate Judge Timothy S. Hogan |
|     and | : | PLAINTIFFS REPLY TO DEFENDANT JOHN L. CRARY S MEMORANDUM IN OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT |
| John Crary | : | |
|     Defendant | : | |

Plaintiffs Dennis Allen, et al. ( Plaintiffs ) submit their Reply to Defendant John L. Crary s ( Crary ) Memorandum in Opposition to Plaintiffs Motion for Summary Judgment. Contrary to Crary s erroneous arguments, Plaintiffs have timely filed all pleadings in this matter and have proffered actual, admissible, factual evidence showing Crary breached his fiduciary duty by failing to monitor and oversee the performance of Leonard D. Kristal ( Kristal ) as an ERISA fiduciary.

A.     **Plaintiffs timely filed their motion for summary judgment.**

Plaintiffs filed a motion to extend the dispositive motion deadline (R. 66 - Plaintiffs Motion for Extension.) No ruling on this motion has occurred to date. Plaintiffs confirmed with the docket entry for Crary s motion for summary judgment, (R. 68), that Plaintiffs response was due November 8, 2003 (a due date that comports with the Local Rules of the Southern District of Ohio; See S.D. Ohio Civ. R. 7.2(a)(2)). As November 8, 2003 was a Saturday, Plaintiffs filed their response on the next business day, Monday, November 10. Plaintiffs also filed a cross-motion for summary judgment

against Crary on November 10, well within the thirty day extension sought by Plaintiffs in their motion to extend the dispositive motion deadline.

By now the Court may well be exhausted hearing of the parties dispute over the timeliness of Plaintiffs filings on November 10. Without belaboring the issue, Plaintiffs make two points regarding Crary's late filing of his opposition to Plaintiffs cross-motion for summary judgment. First, Crary omits any reference or acknowledgment that Plaintiffs requested an extension of time to file dispositive motions. Crary cannot disingenuously allege that Plaintiffs have willfully disregarded deadlines in this matter, while knowing full well that Plaintiffs sought an extension of the dispositive motion deadline. Plaintiffs counsel approached Crary's counsel about an extension of the dispositive motion deadline, only to be ignored by Crary's counsel. When asked if he would participate in an informal discovery conference with the Court to discuss an extension of this deadline, he refused. Crary also misleadingly intones in a footnote that Plaintiffs attempted to file supplemental memoranda on November 18 and 20, 2003, in connection with their motion for summary judgment. Pursuant to the direction of the Southern District's Clerk's Office, Plaintiffs were required, due to a new procedural requirements of the electronic filing system, to refile their motion for summary judgment.[1] Plaintiffs made no attempt to file additional memoranda supporting their motion for summary judgment; Crary's implication to the contrary is entirely untrue and misleading.

---

[1] Plaintiffs simply had to electronically refile documents that were originally filed and mailed on November 10. The Court subsequently deemed that Plaintiffs motion for summary judgment against Crary was filed on November 10, 2003. (R. 101 - Order.)

2

Second, Crary's delay in filing his opposition memorandum is solely the result of his failure to check the email verification sent by the Southern District's Clerk's Office. Had counsel for Crary performed even a cursory review of these email verifications, they would have been alerted that their memorandum in opposition to Plaintiffs' motion for summary judgment was not filed on November 26, 2003. Indeed, in the Court's subsequent order deeming Plaintiffs' motion for summary judgment as being filed on November 10, 2003 (R. 101 - Order), the Court specifically instructed Crary that his opposition memorandum would be due on December 4, 2003. Thus, even though Crary failed to file his memorandum on the date he wished (November 26, 2003), he had an additional eight days to timely file his opposition.[2] Crary, however, does not provide any justification why it took almost two weeks to discover that his opposition memorandum had not been filed. Enough of this.

**B.    Plaintiffs Have Proffered Actual, Admissible, Factual Evidence Showing Crary Breached His Fiduciary Duty by Failing to Monitor and Oversee the Performance of Leonard D. Kristal ("Kristal") as an Erisa Fiduciary.**

Crary asserts that Plaintiffs have offered no factual, admissible evidence to support their claims. Plaintiffs need not restate here all of their arguments and supporting evidence contained in their motion for summary judgment against Crary. Defendant Crary continues to wholly mischaracterize Plaintiffs' claims and the evidence and deposition testimony supporting those claims.

---

[2] Crary's highlighted version of Plaintiffs' Findings of Fact and Conclusions of Law (R. 120), which was presumably to be filed at the same time as his opposition memorandum, was filed on December 15, five days <u>after</u> he filed his opposition memorandum. While Crary stated that his opposition memorandum "slipped through the cracks," Crary does not offer an explanation as to why R. 120 was also not included with his November 26 filings, nor why it was not filed simultaneously with his opposition memorandum.

1.  **Crary Breached His ERISA Fiduciary Duties By Failing to Monitor and Oversee Kristal as Plan Fiduciary.**

    a.  **It Is Undisputed That ERISA Fiduciary Liability Rests Upon Those Who Have the Power to Appoint, Retain and Remove Plan Fiduciaries.**

Crary has not refuted (nor can he refute) the fundamental legal basis for Plaintiffs claims - that where an employer establishes and maintains an employee benefit plan, members of the employer s board of directors are plan fiduciaries to the extent they control selection or termination of [plan] fiduciaries. *See, e.g., Authier v. Ginsberg*, 757 F.2d 796, 801 (6th Cir. 1985) (summarizing holding of *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir. 1984), cert. denied, 489 U.S. 1078 (1989)); *accord*: *American Federation of Unions v. Equitable Life Assurance Society of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) (holding that individual can be liable under ERISA for failure to adequately train and supervise an ERISA fiduciary where the individual was in a position to appoint or remove plan fiduciaries and monitor their activities); *Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*, 2003 U.S. Dist. LEXIS 17492 at *60 (S.D. Tex. September 30, 2003) ( A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power. ); *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) (finding that directors with power to appoint plan fiduciaries can be considered fiduciaries in certain circumstances), cert. denied, 506 U.S. 1054 (1993); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 640 (W.D. Wis. 1979) (failure to monitor the conduct of seller trustees is a failure to discharge fiduciary duties with the prudence and diligence required by ERISA Section 404(a)(1)(B); *Shaw v. International Ass n of Machinists and Aerospace Workers Pension Plan*, 563 F.Supp. 653, 657 (C.D. Cal. 1983) (officials of a company which sponsors a plan are themselves fiduciaries to the

extent that they retain authority for selection and retention of plan fiduciaries because, to that extent, they have retained discretionary authority or discretionary control respecting management of the plan.)

Instead, Crary seeks to convince the court that Plaintiffs attempt to hold him liable as an ERISA fiduciary <u>solely</u> through his corporate title as Chairman of the Board. Plaintiffs here do not seek liability against Crary for business decisions or routine corporate activities. Rather, Plaintiffs here focus on Crary's failure to monitor and oversee Kristal in Kristal's exercise of his fiduciary duties to the plans - while knowing that Kristal functioned as the fiduciary for those plans. In his memorandum in opposition, Crary relies on *Akers v. Palmer*, 721 F.3d 226 (6th Cir. 1995), in which the court rejected the plaintiffs' attempt to hold an employer's board member liable under ERISA for the following actions and decisions: actions *prior* to the creation of [the] employee benefit plan, with respect to the company's selection of the particular terms of the plan; the decision to fund the plan with newly-issued stock, which the court correctly described as a "settlor function"; and the decision to terminate the plan, which, under settled law, cannot be the basis for a breach of fiduciary duty claim under ERISA. *Id*. at 229-232 (emphasis in original). Plaintiffs do not attempt to hold Crary liable for actions remotely similar to the actions attributed to the defendant in *Akers*. Rather, all the conduct alleged as violations on Crary's part occurred during the period the health plan and 401K plan were in operation at the Lassen Companies, Inc.

Crary further relies on *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998), in support of the proposition that "the appointment of an officer for the corporation by the Board itself is a business decision and is in no way automatically subject to ERISA's fiduciary duties. *Sengpiel*, however, has absolutely nothing to do with the decision and/or authority to appoint a fiduciary to the company's health and 401K plans. In *Sengpiel*, the court found that a company's decision to transfer

5

responsibility for payment of the plaintiffs' retirement benefits, as a result of a spin-off of the company into a joint venture, could not constitute a breach of fiduciary duty under ERISA. *Id.* at 666. The court held that the spin-off decision was a "business decision" and the "company's ministerial actions to implement its business decision [did] not amount to an exercise of discretion under ERISA's definition of fiduciary." *Id.* The facts and holding of *Sengpiel* have no relevance to the particular allegations and facts of *this* case.

### b. Crary Possessed the Power to Appoint, Retain And/or Remove Leonard D. Kristal.

Contrary to Crary's protestations otherwise, Crary had the power to appoint, retain or remove Kristal *as a fiduciary to the Lassen plans*. Crary states in his memorandum in opposition that Plaintiffs never defined or described how Crary had such power. However, Plaintiffs provided ample evidence that Crary had both the <u>procedural</u> and <u>practical</u> means to remove Kristal as an ERISA fiduciary.

Lassen's Board had three members: Crary, Kristal and Bob Morris. Crary was the majority shareholder in the corporation, (Crary, pp. 15, 52.), was to be paid $130,000 as a "consultant" to Lassen, and was given all of the duties and responsibilities customarily associated with the position of Chairman of the Board. (Dep. Ex. 97 - Consulting Agreement.) It is disingenuous for Crary to argue he had no authority and no ability to appoint or remove Kristal, when clear and convincing evidence points otherwise. Crary's own testimony shows he knew that when he executed the employment agreement on behalf of Lassen (as its Chairman of the Board) he gave Kristal complete authority over all of Lassen's employees benefit plans. (Crary Dep., at 81; Dep. Ex. 96.) That employment agreement made Kristal subject to

removal for a variety of factors, including engaging in illegal conduct. And - let there be absolutely no question - conversion of employee contributions to a health plan is blatantly illegal conduct.[3] *Lopresti v. Terwilliger*, 126 F.3d 34 (2nd Cir. 1997); *Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254 (D.C. Cir. 1994) (deduction of employee contributions from wages and not paying them to plan is fiduciary breach). Plaintiffs presented evidence from both Kristal and Bernet, Jr. that Bob Morris agreed that Kristal should be removed - thus giving Crary (the majority shareholder) the requisite votes to remove Kristal as an ERISA fiduciary.

Plaintiffs also presented clear evidence that <u>as a practical matter</u>, Crary was the <u>only</u> person at Lassen who had the actual authority to remove Leonard Kristal. Both Crary and Morris expressly conveyed to the management personnel at Wright-Bernet that while Kristal was primarily responsible for operating the day-to day activities at Lassen, Crary was the top decision-maker in the company. When Bernet, Jr. suggested to Crary during a May 1999 telephone call that Bob Morris should replace Kristal as the contact for vendors for Wright-Bernet, Inc., Crary was noncommital and said, Well, I ll think about it. (Bernet, Jr., p. 27.) Crary did not tell Bernet, Jr. that he had no authority whatsoever to remove Kristal.

Additionally, after Bernet, Jr. informed Crary, Kristal and Morris of his displeasure of the operation of Wright-Bernet by a letter dated June 15, 1999, (a letter in which Bernet, Jr. specifically addressed Lassen s failure to remit child support payments withheld from employee checks), Crary traveled to Wright-Bernet the next day to

---

[3] In addition, the failure to remit withheld child support payments and deducted taxes is also blatantly illegal. Crary had clear knowledge of both these facts.

7

address Bernet, Jr.'s concerns - hardly the act of a powerless Chairman of the Board.[4] At this June 16, 1999 meeting, "... everybody realized that whatever Lenn [Kristal] said really was meaningless, so what John [Crary] said was the only thing that mattered..." (Bernet, Jr., p. 48.) Michael Lindemuth, who attended the June 16 meeting testified, "We were basically told in the meeting by John Crary that John does not always like the way Lenn handles things, that sometimes it drives him absolutely nuts, but that <u>Lenn was his man and that if anyone in the room didn't like it they probably should think about finding employment elsewhere.</u>" (Lindemuth, p. 24.)[5]

Thus, Crary made it abundantly clear to management personnel at Wright-Bernet, Inc. that he was the individual who had the ultimate authority to remove Kristal from his position at Lassen. At no point did Crary ever tell those in the highest management positions at Wright-Bernet, Inc. that he had no authority to remove Kristal. Indeed, Crary explicitly told management personnel that he supported Kristal and that if anyone disagreed with his decision, she should find another job. At all times when confronted with Kristal's malfeasance, Crary never emphatically stated he was powerless to do anything. Rather, Crary's responses ranged from noncommital statements such as "I'll think about it," or "Lenn's working on it," to clear, affirmative

---

[4] Crary inexplicably contends that Michael Lindemuth's verification of Bernet, Jr. contact with Crary in June 1999 is inadmissible hearsay. Crary traveled to Wright-Bernet on June 16, 2003 to discuss Bernet, Jr.'s concerns with management personnel - a meeting <u>Lindemuth attended</u>. Plaintiffs cannot comprehend why Crary says that Lindemuth cannot verify the subject matter of Crary's trip to Wright-Bernet in June 1999.

[5] Crary does not, nor can he, contest that Bernet, Jr.'s and Lindemuth's testimony <u>corroborates</u> much of Leonard Kristal's testimony regarding Crary's authority to oversee and remove Kristal. Instead, Crary again simply alleges that Kristal is not truthful, without contesting specific details in his deposition testimony that have been verified by other witnesses.

8

support for Kristal even after learning of Kristal's serious financial misdeeds.

Crary mischaracterizes Bob Bernet, Jr.'s deposition testimony, as he does with other deposition testimony, by removing a single line of testimony from the context of the questioning and the totality of the testimony. Crary manipulates deposition testimony, completing ignoring the context of the testimony and leading the Court to believe that the testimony means something completely different from the context. Take the following example: on page 11 of Crary's memorandum in opposition, he states, "[w]hen asked if the chain of command for Lassen on paper was 'John, Len, Bob,' Bernet specifically stated that he never saw anything official to that effect on paper." The next sentence reads, "This makes any evidence Bernet has to offer on this subject speculative and inadmissible; it was certainly not a subject on which he could competently testify." (Crary's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p. 11.)

Crary completely disregards the context of Bernet, Jr.'s cited testimony. Here is what Bernet, Jr. had to say about Crary's ability to remove Kristal:

Q:  Right, but the change at the top would have to be requested?

A:  Right. To get Lenn out of the picture, obviously, the only one that could change Lenn's duties was John Crary.

Q:  Why do you believe that, that he was the man to do it?

A:  Because the chain of command was John, Lenn, Bob.

Q:  That was both on paper and as a practical matter?

A:  Like I said, I never saw anything official on paper.

Q:  **But you believe that to be true?**

9

**A:** **Correct. And that's what Bob told me.**

**Q:** **Bob Morris?**

**A:** **Correct.**

**Q:** **As far as the office when in Hamilton, was that their general belief, also?**

**A:** **Yeah, I would say so.**

**Q:** **So if you wanted Lenn to do or stop doing something, the only person who could really make him do that would be John Crary?**

**A:** **Correct.**

(Bernet, Jr. dep., pp. 26-27.)

Amazingly, Crary would have this Court believe that the former president of Wright-Bernet, Inc, who had contact with John Crary, Lenn Kristal and Bob Morris and was integral in Lassen's business acquisition of Wright-Bernet, cannot "competently testify" about his knowledge and understanding of the operation of Wright-Bernet, Inc. by Lassen. The unreasonable implication of Crary's "standard" is that no individual other than Crary himself can "competently testify" about Lassen's operation of Wright-Bernet, Inc.

Crary even arbitrarily edits his own deposition testimony to fit into his version of the facts. Plaintiffs cited to page 81 of Crary's deposition for the proposition that Crary gave Kristal complete authority over all of Lassen's employment benefit plans. Yet, Crary contends that Plaintiffs have not honestly presented evidence, and that Plaintiffs' interpretation of Crary's testimony on page 81 of his deposition "misconstrues [his]

testimony; the worst is that it is intentionally misleading. (Crary's Opposition Memorandum, p. 8.) Here is that testimony, in its entirety, and in context:

> Q: When you executed the employment agreement that's been marked as an exhibit between Lassen Companies and Lenn Kristal, did you understand that his duties as CEO would encompass overall responsibility for the benefit plans offered be the company to its employees?
>
> A: My understanding was that he would be totally in charge of all the operations of the company.
>
> Q: **And would that include the benefit plans?**
>
> A: **It wasn't addressed specifically, but it would be implied, sure.**

Crary's Opposition would have the court believe that the last - and crucial - question above was not asked. While perhaps disingenuous, it is truly misleading to cite only highly selective portions of critical testimony and to not acknowledge the context within which the question occurred.

### c. Crary Had Both Actual and Constructive Knowledge of Kristal's Failure to Remit Deducted Health Care Premiums to Great West.

Plaintiffs have provided direct evidence that Crary had both actual and constructive knowledge of Kristal's failure to remit deducted health care premiums to Great West. Plaintiffs do not "disdainfully" use his wife's accident in February 1999 to show his actual knowledge of Kristal's failure to remit health care premiums to Great West. The simple fact is that the accident, while unfortunate, did occur and is evidence that Crary knew that medical bills were not being paid. Michael Lindemuth testified that:

> . . . John was aware of the problem, simply because, I believe it was his wife, was involved in a serious accident. I'm not sure of the timing of the accident. I believe it occurred in '99. And there were a lot of medical bills related to that accident, and those medical bills were not being paid. So, in my opinion, John Crary was aware that there was a problem with the health insurance, as far as premiums not being paid, because his bills were getting rejected along with everyone else's . . . we saw the health insurance bills from Great Western (*sic*). [Crary's] name was on there . . . [s]o I know at that time he knew what the status of the health insurance was, because he was in the same boat as everyone else." (Lindemuth, pp. 36, 66.)

Randy Pickering testified under oath and under penalty of perjury that he made three telephone calls to Crary informing him of Kristal's failure to remit employee health care deductions. At one point Pickering advised Crary that "fraud" was occurring with the health plan. (Pickering, p 56).

To counter this damaging testimony, Crary argues in his memorandum in opposition that no phone records whatsoever support Pickering's testimony that he telephoned Crary on three occasions in 2000 to discuss Kristal's failure to remit health care premiums to Great West. (See Crary's Memorandum in Opposition, p. 9.) However, Crary to date has <u>never</u> divulged his cell phone number to Plaintiffs.

In his Opposition, Crary discusses Michael Pekar's deposition testimony regarding a telephone call Mr. Pekar made to Crary during the summer of 2001. In an egregious example of parsing deposition testimony to fit his version of the facts, Crary asserts that "on page 18 [Pekar] states that the call was about 'backpay'". Crary clearly seeks to have the court understand (or at least implies)  that Pekar did not discuss the issue of medical bills with Crary. Instead, what has occurred is that Crary ignores the context of the testimony, and goes so far as to select only certain words from particular sentences and repackage them as though they were undisputed fact. Pekar's actual

testimony is as follows:

> Q: And do you remember the substance? Could you give me a summary of the substance of the call or as much as you can remember?
>
> A: In a nutshell, the only - - I don t know how many weeks of backpay at the time. **A bunch of backpay and roughly $8,000 in medical bills.**

(Pekar previously explained in his deposition testimony that he called Crary to discuss the problem of Lassen owing him  . . . roughly ten weeks backpay and roughly $8,000 in unpaid insurance bills, not to mention the premiums that were getting deducted out of my paycheck.   (Pekar depo., pp. 11-12.))

Here, Crary has picked the word  backpay  out of a single sentence and has alluded that this is the only subject Pekar discussed with Crary during the telephone conversation.  The context of the testimony, however, clearly shows that Pekar had the understanding that Crary knew of <u>all</u> of the financial problems at Lassen, including the problems with payment of health care premiums.

In addition to having direct knowledge of Kristal s misappropriation of Wright-Bernet employees  health care contributions, Crary also had constructive knowledge of Kristal s breach of fiduciary duty.  While Crary states that Plaintiffs may not  bootstrap  Crary s knowledge of Lassen s poor financial condition as evidence of his <u>direct</u> knowledge of Kristal s failure to remit health care premiums to Great West, his knowledge of a plethora of financial misdeeds committed by Kristal, including his failure to remit monies received from employees from payroll deductions, indicates <u>constructive</u> knowledge of Kristal  fiduciary breach.  Crary cannot overcome Plaintiffs  motion for summary judgment simply by denying any evidence presented by Plaintiffs in

13

support of their motion.

**C.    Crary is liable as a co-fiduciary.**

Crary disingenuously contends that he is not liable as a co-fiduciary because he did not know that Kristal was a fiduciary, did not know that Kristal committed a breach, and that he did not know he participated in Kristal's breach. (See Crary's Memorandum in Opposition, p. 17.) As discussed *supra*, pp. 11-13, Plaintiffs have clearly shown that Crary knew Kristal was a fiduciary, knew Kristal beached his fiduciary duties, and knew of his participation in those breaches. Accordingly, Crary's argument here is without merit.

**D.    Plaintiffs Previously Addressed Crary's Possible Liability for Breach of Fiduciary Duty Based on His Own Exercise of Discretion Over the Management and/or Disposition of Plan Assets, and/or as a Non-Fiduciary Party-in-Interest.**

Crary incorrectly states that Plaintiffs have "[f]or the first time in this lawsuit" alleged that Crary is liable for breach of fiduciary duty under ERISA because of his own exercise of discretion and control over management and/or disposition of plan assets, and that Plaintiffs, "at the eleventh hour in this litigation," have only now alleged that Crary is liable as a party-in interest.

Crary is simply (again) incorrect. In prior pleadings in this case Plaintiffs specifically addressed these two areas in their memorandum in opposition to Crary's motion to dismiss, filed on August 26, 2002. (R. 32 - Plaintiffs Memorandum in Opposition to Crary's Motion to Dismiss.) In their memorandum, Plaintiffs stated the following:

In addition to Crary's role in appointing and retaining Kristal in Kristal's fiduciary

14

    capacities with Lassen, Crary may be liable herein under ERISA on two additional grounds, based on evidence adduced during Kristal's deposition. Crary may held liable (1) for his own independent exercise of "discretionary control or discretionary authority . . . respecting management or disposition of [plan] assets" and (2) under Section 406 of ERISA for his knowledge of and assistance in the breaches of fiduciary duty by Kristal. See 29 U.S.C. § 1002(21)(A), ERISA § (3)(21)(A); 29 U.S.C. § 1106, ERISA § 406.

(R. 32 - Plaintiffs' Memorandum in Opposition to Crary's Motion to Dismiss, pp. 12-13.)

    Plaintiffs specifically alleged that Crary could be held liable under ERISA Section 406 as a non-fiduciary party in interest. (See Plaintiffs' Memorandum in Opposition to Crary's Motion to Dismiss, p. 14.) Plaintiffs also alleged in their First Amended Complaint as a third claim for relief that Leonard Kristal and John Crary were parties in interest liable for prohibited transactions under ERISA. (See First Amended Complaint, ¶¶ 42 and 43.) It is wholly disingenuous for Crary to imply that Plaintiffs have never raised these issues prior to their motion for summary judgment. Accordingly, Crary may still be held liable under ERISA Section 406 for his assisting Kristal in his breaches of fiduciary duty. *See, e.g., Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988) (non-fiduciary could be held liable under ERISA Section 406(b)(1), 29 U.S.C. 1106(b)(1), where the non-fiduciary aided and assisted a plan fiduciary who engaged in prohibited transactions); *Harris Trust and Savings Back v. Salomon Smith-Barney, Inc.*, 530 U.S. 238 (2000) (holding ERISA Section 502(a)(3) extends its authorization to suits against a non-fiduciary party-in-interest engaging in prohibited transactions); *McDannold v. Star Bank*, 261 F.3d 478, 486 (6th Cir. 2001) (applying *Harris Trust* and confirming holding of *Brock v. Hendershott*).

    Plaintiffs have shown that Crary knew full well of Kristal's failure to remit

employee contributions to the Group Health Plan, yet Crary took no action to stop this. Under *McDannold v. Star Bank*, and *Harris Trust v. Salomon Smith-Barney*, even if Crary is found not to be a fiduciary, as a party-in-interest, he may be held liable for participating in a prohibited transaction. Indeed, in his memorandum in opposition Crary does <u>not</u> dispute that he was a party-in-interest.

**D.    The Union Has Standing to Sue.**

Crary cites *Local 6-0682 International Union of Paper, Allied-Industrial, Chemical & Energy Workers v. National Industrial Group Pension Plan*, 342 F.3d 606 (6th Cir. 2003) for the proposition that a union is not one of the enumerated parties listed in Section 502(a) of ERISA. *Id*. at 609, n.1. However, the union in *National Industrial Group Pension Plan* never alleged it had statutory standing to sue, and it requested the court establish standing by creating a federal common law cause of action for <u>negligence</u> under ERISA. Plaintiffs here do not seek the creation of a federal cause of action for negligence under ERISA. A union may serve as a §502(a) plaintiff to the extent it can show that it <u>represents</u> plan participants who are members of a union. *See, e.g., Air Line Pilots Association v. Northwest Airlines*, 627 F.2d 272 (D.C. Cir. 1982); *Walker v. Jaffee*, 5 E.B.C. 2736 (W.D. Tex. 1983); *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 922 (7th Cir. 2003) ( . . . we do not think that by confining the right to sue under section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants. The union in such case is not seeking anything for itself; the real plaintiffs in interest are plan participants. ).

16

Here, the Union has continuously asserted that its standing is based on its representative capacity. At no point has the Union maintained it has standing to sue as a union, nor has the Union attempted to seek any recovery that would flow solely to the Union. Therefore, the Union has standing in this case.

### E.  Plaintiffs Seek Appropriate Remedies in this Case.

In *Varity v. Howe*, 516 U.S. 489 (1996), the Supreme Court held that due to ERISA's basic purposes and the statutory language itself, Section 502(a)(3) authorizes lawsuits for individualized equitable relief for breach of fiduciary obligations for injuries caused by violations that Section 502 does not elsewhere adequately remedy. *Id*. at 512. At the Circuit Court level, *Varity* held that plaintiffs, though not entitled to compensatory damages under ERISA for breach of fiduciary duty, were entitled to restitution for benefits of which they were deprived, and were awarded the amount of their past-due benefit. *See Varity v. Howe*, 36 F.3d 746 (8th Cir. 1994), *aff'd on other grounds*, 516 U.S. 489 (1996); *see also*, *In re Unisys Corporation Retiree Medical Benefit ERISA Litigation*, 57 f.3d 1265 (3rd Cir. 1995), *cert. denied*, 517 U.S. 103 (1996) (ordering injunction for specific performance of assurances to lifetime benefits and restitutionary reimbursement for back benefits, but no right to money damages).

Crary contends that Plaintiffs' reliance on *Varity v. Howe* is misplaced. However, Crary does not dispute the law that *Varity* established. Rather, the only response Crary has to the *Verity* decision is that the Plaintiffs in the case originally sought reinstatement to the plan. Crary does not address the ruling that emerged from *Varity*, nor does he

17

address the resulting case law where other courts have upheld the holding in *Varity*.

Crary's contention that Plaintiffs may not seek recovery for his breach of fiduciary duty is without merit. The plaintiffs - participants in the Group Benefits Plan - seek proper relief under ERISA in the form of equitable restitution. Plaintiffs only seek restitution of <u>what they would have received</u> had Kristal not breached his fiduciary duties, and had Crary adequately performed his. Since the Plan at issue no longer exists, in the exercise of its equitable powers, the court may either a) restore the plan to existence and order sufficient funds into the plan to award all benefits due (and to pay the cost of administration); or b) order equitable restitution directly to the participants in lieu of restoration of the plan (as permitted by the court in *Varity*). The equitable restitution due to Plaintiffs would be in the amount of benefits due them under the terms of the plan. *See, e.g., Strom v. Goldman Sachs & Co.*, 202 F.3d 138 (2nd Cir. 1999) (permitting payment of expected insurance benefits to a widow of a plan participant as equitable relief despite the fact the remedy was monetary relief); *Clair v. Harris Trust & Savings Bank*, 190 F.3d 495, at 498 (7th Cir. 1999) *cert. denied* 120 S.Ct. 1166 (2000) ( . . . not all monetary relief is damages. Equity sometimes awards monetary relief, or the equivalent, and restitution is both a legal and an equitable remedy that is monetary yet distinct from damages. ).

**IV.    CONCLUSION**

Crary's memorandum in opposition to Plaintiffs' motion for summary judgment is wholly without merit. Conversely, Plaintiffs' motion for summary judgment against Crary should be granted. There are no genuine issues of material fact and Plaintiffs are

entitled to judgment as a matter of law against Crary because he appointed Leonard D. Kristal as a plan fiduciary, possessed the authority to remove Kristal, yet failed monitor and subsequently remove Kristal after learning of his malfeasance. Accordingly, Plaintiffs motion for summary judgment against Defendant John L. Crary should be GRANTED.

Respectfully submitted,

s/ David M. Cook

_____
David M. Cook (0023469)
Stephen A. Simon (0068268)
David M. Cook, LLC
22 West Ninth Street
Cincinnati, Ohio 45202
Phone: (513) 721-7500
Fax:    (513) 721-1178

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

      I hereby certify that on December 23, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Stephen R. Felson, 617 Vine Street, Suite 1401, Cincinnati, Ohio 45202, Trial Attorney For Defendant Crary, Paul D. Marotta, The Corporate Law Group, 500 Airport Blvd., Suite 120, Burlingame, CA 94010, Of Counsel for Defendant Crary, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: Leonard Kristal, 107 Diablo Drive Kentfield, California 94904; Christopher D. Denny and Jennifer Chen, The Corporate Law Group, 500 Airport Blvd., Suite 120, Burlingame, CA 94010, Of Counsel for Defendant Crary.

                                                                 s/ David M. Cook

                                                                 _____
                                                                 ATTORNEY FOR PLAINTIFFS